Good morning, Your Honor. Good morning, Your Honor. We have a case in court. We're going to introduce Mr. Al Farr on this case, which is no longer an association at all. I'd like to assert that I have found the evidence to be completely and utterly correct. I want to focus, just on off-air, on what this case is looking like, and I'd like to let you know what we're seeing. San Francisco, that's a very strange region in the U.S., which means that the plaintiffs have essentially a unilateral ability to decide how long they're going to stay in the region    They're going to stay in the U.S. They're going to stay in the U.S. Let me ask you this, Mr. Canales, at your point, that before the landlord can ask the tenant whether he would consider moving out for a consideration, the form, the disclosure form, has to be delivered to the tenant. I know Your Honor, it's more than that. Yes, it does need to be delivered first, but it also may not have been delivered before the landlord. I want to talk to you about, in terms of negotiation, does negotiation include inquiry as to whether the tenant is interested in negotiating? Yes, Your Honor, it does in terms of the importance of very broad interdependent issues. So, what it boils down to then, if you're correct, is that the landlord can never ask the tenant, are you interested in moving out, and only the tenant who can initiate the conversation. I think, in a very narrow set of circumstances, the landlord can walk up to you and say, here's this form, how will you sign it so that we can discuss the possibility of a liability for the first time. But having already provided a form, they have to get the signature right then and there for you. Well, enough to provide the form, whereas in regulations of justice, you have the form signed before you can ask the tenant if it's interested in negotiating. Well, I think, Your Honor, given the terms of the ordinance itself, to play by what she says, it requires expensive buyout negotiations for a lifetime. The landlord has to provide the written disclosure, and it has to include a space where that will eventually decide a date. It's basically too far. So, it has to include the disclosure form, step one, and say, at that point, maybe you're interested in moving out. But you have to get the signature on the form, and before you can start discussing negotiation of justice. I think that's important. Where in the ordinance is it required that the tenant sign the blank form that has to be signed before the landlord can discuss or negotiate? Your Honor. Well, Your Honor, in fact, the position of the city and the district market space is that that's how it's required. That's right. And the reason it's not in that position is because it's not recorded. Well, I think, respectfully, I disagree. I think it's because the ordinance that's prior to the financing buyout negotiation is required to provide it and to get the signature. Your Honor, does it say that you have to get a signed signature before negotiation, or do you have to deliver the form before negotiation? You have to deliver the form. That's right. With the space. With the seated space. And the tenant can say, I don't need you to take this study. He's saying, I don't have my glasses on. I don't know where the space is. It's discussed at the negotiation. Your Honor, I think that as we're talking about the text of the ordinance, we have to think about the text, not maybe the practical matter. Your argument is the landlord doesn't know whether the tenant wants to discuss or can't have any proof that the tenant has received the form until he's done the signs of it. He doesn't want the text of the statute. Your Honor, I'm sure you're angry with that reading, but I do want to say that I don't agree with that reading. Where is the text of the statute? Does it say the form must be signed before negotiations? And it does. I think, Your Honor, that I agree with that. You're sort of avoiding the question. It's the answer that the text doesn't require the signature. Why aren't you convincing by having negotiations? They have to be faithful when calling for the signature. Who's going to offer the signature? But nowhere does it say that the tenant has to sign the form before the negotiation starts. Do you agree on that and go to some other point? I'm happy to go on because, Your Honor, quite frankly, I don't know that it matters. You mentioned that it's a practical fact. It's the same result, and I believe that it is. If I'm on the landlord and I hand over the form, and the tenant doesn't sign it immediately, I'm not going to take my chances of committing a violation of the ordinance in the hopes that somewhere down the line, I can get them to make sure that my signature is okay. That's the fact, and that's the promise. With the ERA, which is the incorporation of the landlord, that attests to the landlord's notice, and maintains and supports incorporation, one more time. Well, I think it makes the whole of this requirement that the tenant should sign the form sort of not going to do it. But the fact is that the failure to obtain that signature subjects the landlord to potential penalties, regardless of whether he's also a tenant. Doesn't this form, issued by the rent stabilization and arbitration board, kind of like the tenant, for whatever reason, just doesn't sign and acknowledge it, but doesn't use it? I think so, yeah. Because actually that's the description of the landlord. So I'm assuming that the landlord didn't know, he never gave you the form, and he files it with the board, and it's like a process. You know, if you can complete a year of fee, all he has to do is file an affidavit saying, Hey, I served on your prescribed by the landlord, and that's a very good notice. Well, no, I don't think it is. I don't know what's the purpose of the thing. Well, I have three options. Let's see if he might want us to sign it. I'm going to assume that he has three options. Well, I'll bet the ordinance requires both. It requires that you serve that form before the board, of course, and it also requires that you subject signed forms of the tenant in the failures that you might have won. Since I explained your point, is there any language in the ordinance that says, in your honor, we will discuss this in your line of negotiations without subjecting it to ordinance? Well, your honor, as I said, I think, I disagree. I believe that the language of the ordinance does say that, but even if it doesn't, it's in the board's name. Well, I think if you read the section 37.9817, that that is fairly clear, and I don't think that the city's forms do anything to dispel the notion that it needs to be applied and signed in advance. In fact, that particular form that I directed you to, perhaps, above all else, I don't agree that it's broken the law. I think what we've argued, I think in our papers, that there's really no need for this requirement to get a tenant's signature and its constitutional matterings overkill, because you already have a mechanism for ensuring that you deal with it once you've provided notices. But the fact is that the ordinance doesn't require it, whether we think it's needed or not, because if it doesn't do this, or if you guys had to do this, let's just say, well, the district couldn't do this, and every one of the things you would do, and they're larger, and there's judicial relationship reasons, and that's pretty much the extent of the problem. I don't believe it does, and the reason I don't believe it does is that what the city and the district board have said is that the ordinance allows landlords to take their chances. So a landlord can say, okay, here's the farm, you don't need to sign up, let's talk, but then they keep their chance that down the road they're not going to get that signature for whatever reason, and they're on the hook. And so then they're basically forced to take their chance, and people have to kind of see that if they don't get that signature right up front, they may be subject to potential litigation and penalties down the road. Now, in some cases, it may be that they can kind of clean up the mess, if you will, by getting that signature up, in fact, but there's no guarantee. And so it's that fact, that it really creates a chilling effect. Why would a landlord take a chance to introduce biodegotiations when they haven't been able to obtain a signature from a tenant? It has a chilling effect on any realistic idea that they're going to go ahead and biodegotiations with these tenants. When they can't get that signature, they have the confidence that those biodegotiations will not imply that things like this even doesn't mean the same risk to the existence of a litigation. You know, if any defendant refuses to acknowledge or sign up, it's going to affect the whole community. I'm not sure that it necessarily does, because maybe the rules of the procedure allow for people to vote different ways and confirm a different ruling. And I assume at this point, you're confirming that we've created a forum just for the landlords to present files on the floor attesting to the delivery of the notice. If the ordinance allows the LLCs who are not provided with the notice to have a violation, then, now, I do understand your point, but what it does is it provides a fine to LLCs for not having and keeping signed forms from the tenant. In other words, it penalizes a tenant. And each of you say that's uninformative, and I assume we're all arguing about D10 and the ordinances that perform so, including under 10, and quote, a space for each tenant to sign and write the name the landlord provided intended with the disclosure, and quote. Well, if I could go on just a little further, and he continues, a landlord shall retain a copy of the signed disclosure for five years to the owner, the writer, and the tenant. So, if you have that signed form, then you're subject to penalty in regards to whether they would separately file and include the D10 on both sides of the tenant while they're negotiating. But, there's no defense of that in the context of the ordinance of the landlord if there was a final declaration of sort of pandemic, if you're out of debt, the ordinance itself doesn't say you should be liable because you didn't provide notice. It says you should be liable because you did not meet it and you keep the signed form signed by the tenant and it is going to be liable also for not filing with the landlord but as a separate requirement it's not as such because you don't go by this if you're filing with the landlord and you tag the landlord because you can claim that the tenant that you talked to did not file with the landlord and you know, well, because that's not what the actual law is going to do. It's not just that you talk to the landlord and say you're in a bit of a violation so you can't use the signed form. It's not just that you talk to the landlord and he's not willing to give you the signature. It's also that you don't have the form and you're not going to give it to him. The actual sign is each tenant will sign a grant and if the tenant doesn't sign then the landlord doesn't have to give the thing. Well, then they also can't see the violation because they don't have a videotape of handing the form to the tenant with all the detail. What you're saying is that there has to be a signature by the tenant. The only way of showing that the form is delivered. That's not so. That's actually out of respect to tenants and I'm not saying that you whether or not you provided it if you don't have the signature that independently is a violation of the ordinance. No, on the whole there's a tenant who signed it and you know the tenant was not confused with signing and did very well and forced the landlord to keep a signed form that wasn't signed by the tenant. Well, I understand that of course you can't have biodegradation and enter into the agreement because then biodegradation in that agreement would subject you to liability for not having a signed form. No, because you have you have the patient standing there watching and the form is in the tent and you know that it's a person who would have entered the test form and come and looked at it. Your Honor, the argument for me is that you did question the order of the mission of course but the ordinance doesn't say if you have a patient who's willing to testify or a citizen who's willing to file. It also says you need to obtain a signed copy of a signed building on the tenant which is a tenant. If it means you've done exclusive subordination that means you have not to take your restriction of it. I'm not sure I understand that. Does it mean that if two or more tenants or any disabled or senior citizen is a subject of a buyout that the apartment building is now frozen for ten years? That's exactly what it means. So to say if you do not have the option of proceeding with the discretionary reversing orders in the city of New York and you do not have the option of proceeding with the discretionary reversing order in the city of New York and you do not have the option of proceeding with the discretionary reversing order in the city of New York and you           city of New York and you do not have the option of proceeding with the discretionary reversing order in the city of New York. I  not going           city of New York. I am not going to intervene with the discretionary reversing order in the city of New York. I am not going to intervene with the discretionary reversing order.   going      reversing order in the city of New York. I am not going to intervene with the discretionary reversal order in the city intervene with the discretionary  order in the discretionary order in the city to intervene with the  order the discretionary order in New York. I am And once the landlord negotiates and the tenant departs, when the prospective tenant leaves the apartment, the landlord can quote, a higher return rate based on today's market values than the prior tenant was paying before he moved out. Is that right? Yes, and that's exactly so. How does that protect low-income housing for deserving people who can't afford to pay a higher rate? Because, as you get into the taste of that, you get familiar with what you're going to circulate in the total rate, and you're going to suggest that you do a much higher market rate. So you kind of change focus ordinances to the way I was suggesting. If two or more tenants have moved out, it lowers the value of the apartment. So the landlord can't obtain even market rates for the apartment because the value has been lowered significantly. I'm not sure I understand your question. I think the way that you define usual buyout, it has an impact on the affordability of low-income housing because that same unit is now going to be charged with an apartment at a much higher rate. I didn't mention the whole property off-the-ramp argument. I didn't say it has to be converted to condo. So my point is to say that I understand that there would actually be fewer spaces available. But what I'm having a hard time understanding is why this doesn't amount to some kind of a taint thing. This introduces a diminution of the value that the landlord can realize both through future rents and also if they ever wanted to sell the company as an apartment building. As Geoffrey has suggested, it operates as a, along with the new tile and the tile, by virtue of the restriction that we're in. It does increment the layout through renting the property at market rates. But it also furthers the city's interest in making sure that there's a continuing supply of affordable housing. Because the people who are looking for apartments, by definition, and who are contracted for a busking room, which is people who are struggling at lower income levels and are looking to possibly afford housing in San Francisco, are not going to be the type of tenants that are going to be able to afford market ratings in this apartment building. Right? And yet, if the landlord's purpose, like a grocery buyer, is because the landlord wants to participate, there's not a meaning to the person, right? So, if that's the only reason the landlord wants to, I suppose. Anytime a buyout happens, you're either increasing the rent that's going to be passed for that apartment or you're taking it down to the rental market altogether. If you limit condominium conversions for ten years, you're removing that incentive to do the buyout in the first place and say that buyout will not occur. So, you'll not have the effect of either subjecting it to market rents or taking it down to the rental market altogether. So, if that serves the city's interests, it would eliminate the effect of the apartments, essentially, to freeze the status quo. So, you can manage this. People can continue living in apartment buildings that will lower their rates. Whether or not they're getting their commission incentive or if they don't, you can do nothing on the part of the landlord to do anything other than continue renting the apartment. So, whether or not we're right, there's nothing that I can do. No, it does not remove the landlord's ability to do a buyout. It doesn't freeze anything. It removes economic incentives that are in the economic reasons. It could be you want to charge market rent. It could be you want to sell the property. It could be you want to do a condominium conversion. Or something else, but it takes one thing. It puts a limit on what the rent is. It's not a fee. It's not prohibiting the landlord from getting a buyout. It's not forcing the landlord to continue renting the property. It's not going to take it off the market. I don't think it's an understatement. The economic incentives that are in the landlord's mind are being tested as it goes forward. It looks like we could secure a home that would be more affordable. I mean, if you do anything with the property, other than maybe give us that as well. I don't think that's true. And maybe I'm not understanding your concern. The landlord, if he doesn't respect the landlords, he doesn't need to sell the property. The landlord can do that. If he doesn't respect the landlords, he isn't the value of the property. That's what Fredo was suggesting in his question. Unless the property is subject to this ordinance. So, if the owner wants to maximize his financial return by the sale of the property, it essentially cancels the sale value, the fair market value of the property. Because of the ordinance's clout on the value of the property, it limits the buyout, the purchase of the property. It might be interested in buying it from the purchase of the property, maybe the purchase of the property. But if they continue to operate with it as a household, there is no way to participate in a condominium conversion property. The city doesn't have to allow condominium conversions at all. And the only question is whether he is doing it in an arbitrary way. And it's not doing it in an arbitrary way, because, for TV's and for screen TV, categories of tenants, these are people who might have special rules in finding a place to live. I know you talked a little bit with me with regard to the disabled, the young, and the seniors. I mean, I don't know where you think this will come from. I haven't seen it. But that's just me with regard to the law conversions, not involving what we'll call the special tenants. Due to our law conversions, we have the need to introduce it on the availability of affordable rental housing. And now we're going to try to figure out what's the unit that's making the landlord can charge a higher rent or a higher rent to the next tenant that they move. And that's not to say that this ordinance is supposed to be protected. And that is true. There are some landlords who will decide to go ahead and not push it by hand. And they will rent the unit in a market way. But now the question is whether it discourages all buyouts. But if it reduces the number of buyouts, it reduces one incentive, so you can't do more. It therefore reduces the number of buyouts. And it is rationally related to the city's legitimate interest in affordable housing. In the city of Nashville, you have a conversion rate for the property in nine years, not one year, ten years. Yes. So what percentage is that? One. One in ten years. And again, what percentage is that? Is it one in ten years? One in ten years. One in ten years. In the sense that there is no right to engage in a legitimate conversion, and that's the only regulation that's in the city's laws now. Okay. Thank you. Do you address the issue, one of the last few slides you raised, which is is the complication of the price of an apartment in a residential community? Yes. I think the case of the Ohio HM Associates is really very different. It's a very different name. The information in the issue was very different. It was basically the information about all of our financial status. It was an announcement to the world that this entity is disowned. This entity is mismanaging this property. And so what the California Supreme Court held, it came up which, by the way, was decided 14 years after the issue had been raised. So the California Supreme Court said that a protected privacy interest is one where confidentiality is necessary to prevent unwarranted embarrassment and endangerment. It did say that every single piece of financial information is constitutionally protected and is referred to financial information and discloses other information about the person. Credit card statements, banking records. And I think when you're talking about financial status, there's a consultancy of corporations with the management of the property. Is it a fact that the landlord paid a high price for a move out in the case of his wealthy? Not necessarily. Well, if he didn't, it's circumstantial evidence. I don't think that's correct because... And therefore, it may be a bargain for the next tenant to have some more money. Well, landlords can often afford to pay a high price because they can recapture so much of that value by rerenting the unit at market. When you ask, it doesn't mean that they are simply wealthy. The reason that many of these buyouts are high is because the landlord is able to gain so much extra value either by selling the unit or by renting it at market rates. Thank you. The... We haven't discussed the divorce of speech argument. I just briefly... I think it's clear that the finer negotiations on the divorce of speech can change into a very thorough negotiation. So this is part of the negotiation. All right. Thank you very much. Steven, I want you to talk about this. The point I was going to ask about was sort of a pheromone of the school this time, which is this idea that somehow these students are being protected and affordability is being protected by this contribution conversion law. The simple fact is that these people we're talking about, even people who are just independents who are parties to the buyout negotiation, what we're talking about are people who are being given all sorts of procedural protections to make sure that it's not coerced, that it's voluntary. It would be a lot of money to leave and who have made the decision that they're no longer allowed. But it's a lot of things that they're always forcing them out. And so we're not protecting those people. By the end, seven, eight, nine years from now, I'd say, well, by the way, whenever you engage in this negotiation, we're going to use the economy of the university. And so that answers the question of affordability. And quite frankly, by doing this, if you can discourage the buyout negotiations, the only person you're making it affordable for is the existing tenant. You're certainly not increasing affordability for the future tenants because, as we know in time now, there's an increase in rent. And so the current tenant is certainly more affordable than the one in rent control. They, again, have made the contemplated decision that it's more valuable to take the buyout negotiation and leave than to stay. So in your suspension, is the tenant leveraged to negotiate up the price of the buyout? I'm not sure how that would necessarily be the case. In fact, it might be exactly the opposite, which is how I, as a landlord, don't have the option of using my property the way I'm going to do it because I have fewer options for what I can do with that property once I buy it. So you think that the incentive here, or the target, is leveraged? I do, and the last point I was going to make is to the extent that the city is concerned about condominiumizing generally, taking the renters off the market, there's no rational purpose for singling out just a small subcategory of the landlord and saying, everyone else, you can keep doing it, you can keep going through the development process, you guys, because you negotiated with your tenants, you get stuck with a special purpose in the police department, you can keep it. There's no... It has no connection to this particular provision on the broader publication of what the condominium is generally speaking. Why might not be an issue with that? So yes, we can say that it is a rational, healthy, healthy landlord's ranch or subsector, basically, right. I wanted to address also, if I have just a moment, because we didn't talk about appropriation of commercial speech. I think Bhabha and Morrison both stand for the proposition that this is not a traditional commercial speech case. You know, Morrison specifically called out the fact that traditional commercial speech cases will arise in the context of sort of a faceless figure that comes to the fore and you have your economic interaction and then you're done. That's not what's going on here. You're talking about people, especially in San Francisco, who are essentially wed for 30 years in some cases. This is a very, very personal, complex relationship that's outlined in traditional commercial interaction. And that's exactly what Bhabha said. That's exactly what Morrison said. That this is a unique circumstance. And so, you know, the plaintiff's argument is clear. Actually, the decision of this case is for or against Bhabha. Here's a 40-pound horse. But those horses are going to give us the traditional commercial speech framework building that's in the state of San Francisco. It will be a unique dividend that's going to help us in the long run, of course, in many years under compulsion of Bhabha. Thank you very much. Jason's argument is defended and we're adjourned for the day.
judges: Siler, Tallman, Bea